C. T. STEDMAN, Petitioner,

v.

GEORGETOWN SAVINGS AND LOAN
ASSOCIATION, Respondent.

No. B–8267.

Supreme Court of Texas.

Dec. 12, 1979.

Rehearing Denied Jan. 16, 1980.

McDonald, Sanders, Ginsburg, Phillips, Maddox & Newkirk, Sam J. Day and Patrick A. Barbolla, Fort Worth, for petitioner.

Clark, Thomas, Winters & Shapiro, Roy C. Snodgrass, III, Austin, for respondent.

BARROW, Justice.

This suit was brought by petitioner to recover penalties because usurious interest was allegedly charged him by respondent. The determinative question on appeal is whether an accruing charge of 10 percent per annum on the principal amount of a loan commitment which was exacted during the 8 month existence of the commitment was a bona fide commitment fee or a cloak to conceal usurious interest on the permanent loan. The trial court, after a non-jury trial, found that the charge was a bona fide commitment fee and entered a take-nothing judgment on petitioner's claim for usurious interest charged on the permanent loan subsequently made to him by respondent. The court of civil appeals affirmed. 575 S.W.2d 415. We hold that there is evidence to support the findings of the trial court that money paid by petitioner prior to execution of the permanent loan was a bona fide commitment fee and accordingly affirm the judgments of the lower courts.

C. T. Stedman sought a permanent loan commitment from Georgetown Savings and Loan in order to finance the construction of a Dairy Queen in Georgetown, Texas. The commitment was necessary so that he could obtain interim construction funds for the project. After an initial rejection because of the nature of the proposed constructions, Stedman's application for a permanent loan was approved and the association issued its commitment letter on June 13, 1975, by which it offered to lend $60,000 for a period of fifteen years at 10 percent interest. The commitment was to expire in 8 months unless extended by mutual agreement, and it included the following provisions:

"1) A –0–% loan fee shall be payable in advance. . . .

.    .    .    .    .

"8) Upon acceptance hereof the Association will set aside and escrow the funds for the project and interest shall begin to accrue from that date."

Mr. Stedman accepted the commitment offer on June 30, and on February 2, 1976 exercised his option under the commitment for a permanent loan. The loan was made by the association on February 20, 1976. During the period prior to Stedman's exercise of his option, he was billed monthly by the association and paid the total sum of $3,383.31 for "interest due" under the commitment agreement. His permanent loan provides for interest at 10 percent per annum on the $60,000 which was advanced to him on February 20, 1976.

On October 22, 1976 Stedman filed this suit alleging that by charging 10 percent interest before any funds were advanced and by continuing to charge 10 percent after advancing the funds, the association had contracted for, charged or received interest in an amount greater than 10 percent. He sought statutory penalties in the amount of $118,517.04, being twice the amount of interest for which he contracted, together with recovery of all interest paid and attorney's fees. See Art. 5069–1.06.[1]

The trial court made extensive findings of fact and conclusions of law. It found in part that: (1) in the June 13, 1975 letter the association offered a commitment to make a $60,000 loan to Stedman and that this commitment was accepted by him on June 30, 1975; (2) this commitment entitled Stedman, at his sole option, to obtain the loan described therein within the eight month period; (3) the commitment did not bind Stedman to borrow the money from the association and he was free to try to arrange permanent financing on more favorable terms if he chose to do so; (4) in return for this commitment and pursuant thereto, Stedman paid a fee at the rate of 10 percent per annum; (5) this fee obligated the association to make the loan if requested; and (6) the 10 percent per annum fee charged for the commitment was a yardstick used to express the changing price at which the option could be exercised. The court concluded, in sum, that this was a bona fide commitment fee and not interest as defined in Art. 5069–1.01(a).

---

1. All statutory references are to Texas Revised Civil Statutes Annotated.

Article 16, section 11 of the Texas Constitution authorizes the legislature to define "interest" and fix maximum rates of interest. Pursuant to this authority, the legislature has defined interest as "the compensation allowed by law for the use or forbearance or detention of money." Art. 5069–1.-01. In *Crow v. Home Savings Association of Dallas County*, 522 S.W.2d 457 (Tex. 1975), we said:

"[F]or the usury laws to apply, there must be an overcharge by a lender for the use and detention of the lender's money. The judicial inquiry is whether or not this has occurred. Questions of subterfuge or, as also phrased, of a cloak to avoid the usury law, are in point to the determination of this ultimate issue."

■ A bona fide commitment fee is not interest within the contemplation of this statute. It has a different nature and purpose which this Court recently described in *Gonzales County Sav. & Loan Assoc. v. Freeman*, 534 S.W.2d 903 (Tex.1976). We held:

"[A] fee which commits the lender to make a loan at some future date does not fall within this definition [of interest]. Instead, such a fee merely purchases an option which permits the borrower to enter into the loan in the future. See, e. g., *Financial Federal Savings & Loan Association v. Burleigh House, Inc.*, 305 So.2d 59 (Fla.Dist.Ct.App.1974); *D & M Development Co. v. Sherwood & Roberts, Inc.*, 93 Idaho 200, 457 P.2d 439 (1969); *Prather, Mortgage Loans and the Usury Laws*, 16 Bus.Law 181, 188 (1960). It entitles the borrower to a distinctly separate and additional consideration apart from the lending of money. Therefore, the lender may charge extra for this consideration without violating the usury laws. *Greever v. Persky*, 140 Tex. 64, 165 S.W.2d 709 (1942)."

■ The first question we are confronted with is whether there is evidence to support the findings of the lower courts that the pre-disbursement loan charges were "bona fide commitment fees" rather than "interest" as urged by Stedman.

Where there is a dispute in the evidence as to whether the charge is a bona fide commitment fee or merely a device to conceal usury, a question of fact is raised. *Gonzales County Sav. & Loan Assoc. v. Freeman, supra*; *Greever v. Persky*, 140 Tex. 64, 165 S.W.2d 709 (1942). It is fundamental that these fact findings must be upheld by us if there is more than a scintilla of evidence in support thereof. Moreover, in testing these findings, we must review the evidence in its most favorable light, considering only the evidence and inferences which support the findings, and rejecting the evidence and inferences contrary to the findings. *Stodghill v. Texas Emp. Ins. Ass'n*, 582 S.W.2d 102 (Tex.1979); *Martinez v. Delta Brands, Inc.*, 515 S.W.2d 263 (Tex. 1974).

There is no dispute in the evidence that the association's letter of June 13, 1975 was an offer by the association to make a permanent loan. When accepted by Stedman, it became a commitment to do so in accord with the terms thereof. Stedman admitted that such a commitment was necessary to enable him to secure interim financing for the construction. The commitment did not obligate Stedman to close the loan or even to borrow the funds from the association; rather, he could accept or reject the loan at any time within the 8 month period granted by the commitment contract. Thus the contract was in the nature of an option to borrow money in the future. It is conceded by Stedman that any consideration paid for this option would not have been interest within the statutory definition if the permanent loan had not been made.

■ It is urged that a different construction of the commitment contract is compelled by the repeated characterization by the association of the consideration paid by Stedman for this commitment as "interest." The commitment offer itself refers to this consideration as "interest"; the executive officer of the association denominated it as "interest"; and Stedman was billed monthly for "interest" owed under the commitment contract. A similar contention was rejected by this Court in *Gonzales County*

*Sav. & Loan Assoc. v. Freeman, supra,* at 906. In doing so we said:

"The court of civil appeals has improperly stressed the labels placed upon the charges by the savings and loan association as being controlling of their real nature. It has often been said that courts will look beyond the form of the transaction to its substance in determining the existence or nonexistence of usury. *See, Schmid v. City Nat. Bank of Wichita Falls,* 132 Tex. 115, 114 S.W.2d 854 (1938). Such a rule is to be fairly applied to both borrowers and lenders alike. Labels put on particular charges are not controlling."

A. very similar question was presented in *Delta Enterprises v. Gage,* 555 S.W.2d 555 (Tex.Civ.App.—Fort Worth 1977, writ ref'd n. r. e.). This was a suit by Delta Enterprises for usurious interest allegedly paid Gage under the terms of two written contracts. Although the contracts labeled the required payments as "interest," the jury found that such payments in fact were not interest. The court of civil appeals rejected Gage's argument that the disputed sums constituted interest as a matter of law merely because they were labeled as such in the two contracts. In doing so the court relied upon the rule laid down in *Gonzales County Sav. & Loan Assoc. v. Freeman, supra.* The court in *Delta Enterprises* concluded that the disputed payments actually constituted a part of the purchase price for the properties. It said: "It is the *exercisable* price of the option that caused the dispute; i. e., upon exercise of the option, the purchase price was to vary, depending upon when the option was exercised. . . . The holder of the option had the absolute right for three years to purchase the property; however, the longer the holder of the option waited before exercising the option, the higher the *exercisable* price it would have to pay."

We conclude that the trial court did not err in looking behind the label placed upon the consideration paid by Stedman for the option granted to him under the commitment letter of June 13, 1975 and in holding that this was a bona fide commitment fee paid for the privilege of later executing a loan agreement.

Stedman urges that in any event, the 10 percent per annum consideration which he agreed to pay during the time of the option was so unreasonable that it should be held as a matter of law to be a cloak to conceal usury. This contention ignores the fact that it was within Stedman's sole option as to whether or not he desired to secure the permanent loan from the association. If he chose not to do so, he concedes the amounts paid by him during the time of his option would not be usurious interest. The association's president testified that the usual commitment fee was 1 or 2 percent of the loan option where a one-time charge was made; whereas, the accruing charge in question amounted to 5.6 percent by the time the option was exercised. It is seen, however, that this percentage increased in proportion to the time of the option. If Stedman had accepted or rejected the option sooner, the charge would have been less. In the meantime, he was free to shop for a better permanent loan and, being armed with this commitment, was in a stronger position to do so.

In any event the reasonableness of the amount charged would not constitute usurious interest since it was consideration for a bona fide commitment fee. For usury to apply there must be an overcharge by a lender for the use, forbearance or detention of the lender's money. Where the evidence establishes that the charge was made for the commitment option, it would not be for the use, forbearance or detention of the lender's money so as to constitute interest. Rather, the borrower has bought the right to secure a loan if he later decides he wants it. As long as the charge is made for a bona fide commitment fee, it cannot form the basis of a usury penalty against the lender. *Crow v. Home Savings Association of Dallas County,* 522 S.W.2d 457 (Tex. 1975).

In the aforementioned case, Crow brought suit against Home Savings seeking usury penalties based on a fee paid Home in

connection with a loan Crow secured from the First National Bank in Dallas. We concluded that under the evidence the transaction in question was a bona fide loan by the bank, the repayment of which was guaranteed by Home and hence, not subject to the penalties of usury. We said:

> "In the undisputed situation here the loan transaction was with the Bank and the Bank charged and received legal interest. The charge made by Home was for services rendered in connection with the loan. The charge thus made and paid to Home by Crow, regardless of its reasonableness or not, cannot form the basis for a usury penalty against Home."

We conclude that there is evidence to support the trial court's findings of fact that the sums paid the association by Sted-man prior to the exercise of his option for a permanent loan constituted a bona fide commitment fee. We therefore affirm the judgments of the courts below.

POPE and SPEARS, JJ., dissent with separate opinions.

GARWOOD, J., not sitting.

SPEARS, Justice, dissenting.

I respectfully dissent.

I would hold that the ten percent per annum charged prior to the disbursement of the funds was not a bona fide commitment fee for three reasons: (1) the trial court did not include in its findings of fact and conclusions of law a finding that the charge was reasonable [1]; (2) there is no evidence to

---

1. The findings of fact and conclusions of law that are pertinent to a discussion of the commitment, the charge, and their relation to each other are:

### FINDINGS OF FACT

(7) Pursuant to the commitment, Plaintiff paid a fee at the rate of ten percent per annum from July 7, 1975 through the month of January, 1976, being a total of $2,883.31. The fee was paid by Plaintiff and accepted by Defendant in return for Defendant's issuing the commitment to make a loan in the future.

(8) The commitment entitled the Plaintiff, at his sole option, to obtain the loan described therein from Defendant and the consideration for the option was payable whether or not the permanent loan was actually made.

(9) The commitment did not bind Plaintiff to borrow the money from Defendant and he was free to try to arrange permanent financing on terms more favorable to him from other lending institutions.

(12) At no point in time has Plaintiff paid or Defendant received any sums in excess of ten percent per annum computed on $60,000.00.

(13) Other than the total sum of $2,883.31 paid by Plaintiff and received by Defendant in return for the issuance by Defendant to Plaintiff of the commitment, no fees or "points" and no other sums of any nature whatsoever were charged or received in connection with the commitment.

(14) The fee paid by Plaintiff and received by Defendant obligated Defendant to make the loan at some future date and, by paying the fee, the Plaintiff purchased an option permitting him to enter into the loan in the future.

(15) The fee paid by the Plaintiff to the Defendant for the commitment entitled the Plaintiff to a distinctly separate and additional consideration apart from the borrowing of money.

(16) There existed two separate transactions under the facts of this case, a commitment and a subsequent loan, and the Defendant charged a separate fee as compensation for each transaction.

(17) All the payments made under the commitment were made prior to the formal execution and funding of the permanent loan.

(18) The ten percent per annum fee charged for the commitment was a yardstick used to express the changing price at which the Plaintiff's option to enter into a loan in the future could be exercised.

(19) During the period of time relevant to the facts giving rise to this law suit, Defendant was reluctant to make commercial loans, particularly to finance restaurants, due to the facts that Defendant considered such loans to be of a high risk nature and that the demand for low risk residential loans was great, actually exceeding throughout this period of time the amount of money Defendant had available to lend. By setting aside and reserving the funds on its books, Defendant reduced the available money for residential loans.

### CONCLUSIONS OF LAW

(4) Defendant without violating the usury laws, may charge extra for committing to make a loan at some future date and thereby granting Plaintiff an option permitting him to enter into the loan in the future; and the compensation for such a commitment, regardless of the labels, is a commitment fee and not interest as defined in Article 5069–1.-01(a), Vernon's Annotated Civil Statutes.

(5) Since the fee in question committed Defendant to make a loan at some future date, thereby granting Plaintiff an option per-

support the trial court's finding that the charge was not interest, and in fact, the association made judicial admissions that the charge was interest; and (3) the majority opinion, by holding that this charge extracted before disbursement of the loan does not come within the definition of interest, will effectively eliminate future usury suits by creating a large loophole whereby a lender may collect an unlimited amount of compensation for a loan simply by designating the additional charge a commitment fee.

## REASONABLENESS

In affirming the trial court's judgment, the majority relies on a nonexistent finding. The majority states: "The court concluded, in sum, that this [charge] was a bona fide commitment fee . . . ." The trial court, however, did not include in its findings of fact and conclusions of law a finding that the charge was a bona fide commitment fee.

A bona fide commitment fee is a *reasonable* fee paid as consideration for the lender's commitment to make a loan. A legitimate, bona fide commitment fee must be both reasonable and intended only as consideration for having the future loan available. *Gonzalez County Sav. & Loan.Ass'n v. Freeman*, 534 S.W.2d 903, 906 (Tex.1976); *accord, Altherr v. Wilshire Mortgage Corp.*, 104 Ariz. 59, 448 P.2d 859, 863 (1969) (in banc). Reference in this dissent to a bona fide commitment fee will mean a fee that meets both of these requirements.

In *Gonzales County Sav. & Loan Ass'ñ, supra,* at 906, this court noted that in determining whether a charge is a *bona fide* commitment fee and not interest concealed under the "commitment fee" label the amount of the fee must be considered. A lender cannot charge an unusually high commitment fee as a means of obtaining additional profit, and an unreasonable fee is to be deemed interest. *Id.; accord, Fikes v. First Fed. Sav. & Loan Ass'n,* 533 P.2d 251, 265 (Alaska 1975); *Altherr v. Wilshire Mortgage Corp.,* 104 Ariz. 59, 448 P.2d 859, 863 (1969) (in banc); *D & M Dev. Co. v. Sherwood & Roberts, Inc.,* 93 Idaho 200, 457 P.2d 439, 445 (1969). *See generally* Lowell, *A Current Analysis of the Usury Laws—A National View,* 8 San Diego L.Rev. 193, 210–11 (1971). The charge in question cannot be a bona fide commitment fee if it does not meet the reasonableness requirement. *Crow v. Home Sav. Ass'n,* 522 S.W.2d 457 (Tex.1975), cited by the majority, does not stand for the specious stated proposition that regardless of its reasonableness the charge made for the option cannot form the basis of a usury penalty against the lender. In *Crow,* Home Savings Association helped arrange a loan for Crow from First National Bank. In consideration for this service Home Savings charged Crow a $24,985 origination fee. Crow filed suit against Home Savings for usury penalties; he did not sue First National, the actual lender. This court held that regardless of its reasonableness the charge could not form the basis of a usury suit against Home Savings because there must be an overcharge *by the lender* before the usury laws are applicable. *Id.* at 460. The court said:

mitting him to enter into a loan in the future, it was not "interest" as defined by Article 5069–1.01(a) Vernon's Annotated Civil Statutes.

(6) In the event the Court is incorrect in concluding that the fee in question in this case was a commitment fee and not interest, then the transaction in question would nevertheless not be usurious for in that event the Court concludes that a use, forbearance, or detention of money occurred when Defendant set aside and reserved on its books the sum of $60,000.00 for which it was entitled to charge interest at the rate of ten percent per annum and at no time has there been charged, contracted for, or received interest which is greater than the maximum amount authorized by law.

(7) At no time has Defendant contracted for, charged, or received interest, as defined in Article 5069–1.01(a), Vernon's Annotated Civil Statutes, which is greater than the amount authorized by Article 5069–1.02, Vernon's Annotated Civil Statutes; and no violation of Article 5069–1.06, Vernon's Annotated Civil Statutes, has occurred.

Of these findings only 7, 16, 17, 18, and 19 are truly fact findings.

When one negotiates a loan through a third party with a money lender, and the latter bona fide lends the money at a legal rate of interest, the contract as to the actual lender is not made usurious merely by the fact that the intermediary charges the borrower with a heavy commission, the intermediary having no legal or established connection with the lender.

*Id.* at 459–60.

Therefore, before the 10% per annum charge in question can be held to be a *bona fide* commitment fee, the court must determine that the charge was reasonable. Factors to be considered in determining whether a fee is reasonable include: (1) what the committed funds would earn if invested elsewhere for the term of the commitment; (2) the risk to the lender that the yield on the loan as committed will be less favorable than that otherwise obtainable at the time of closing; (3) the value to the borrower of the availability of the funds; and (4) the expense, time, and trouble of investigating the loan application, provided no separate charge for investigation is made. Sintenis, *Current Treatment of the Non-Refundable Commitment Fee and Related Problems*, 86 Banking L.J. 590, 610 (1969).

When these factors are applied in the context of this case, it is obvious that the fee charged here was too large. Since the charge made to Mr. Stedman was at the highest legal rate of interest, ten percent, the charge was equal to or greater than the yield the committed funds could earn if invested elsewhere. In fact, the association received two yields on the money—ten percent per annum interest from Mr. Stedman plus whatever yield the funds could earn in the short-term money market during the period of the commitment (see note 5, *infra*). Similarly, because the commitment was for a loan at the highest legal rate, there was no risk to the association that the yield on the loan as committed would be less favorable than that otherwise obtainable at the time of closing.[2] The fourth factor, the reasonable expenses incurred by the association in accepting the loan application, should not be considered since Mr. Stedman was charged separately for these expenses; i. e., credit report, attorney fees, insurance premiums, and taxes. Thus, only the third factor, the value of the commitment to the borrower, is relevant in determining whether the charge in question was reasonable.

The charge here was 5.6% of the principal, over the eight month commitment period, and was increasing at an annual percentage rate of ten percent. With only one of the four relevant factors for determining the reasonableness of the fee applicable, it is clear that the charge in question was unreasonable. A bona fide commitment fee should not be out of line with the going rate in the community. *D & M Dev. Co. v. Sherwood & Roberts, Inc.*, 93 Idaho 200, 457 P.2d 439, 445 (1969); *see* Hershman, *Usury and the Tight Mortgage Market*, 85 Banking L.J. 189, 210 (1968); Prather, *Mortgage Loans and the Usury Laws*, 16 Bus.Law. 181, 188 (1960). Even when all the pertinent factors are applicable, this rate is usually around one to two percent. *See* Sintenis, *Current Treatment of the Non-Refundable Commitment Fee and Related Problems*, 86 Banking L.J. 590, 610 (1969); Wolf, *The Refundable Commitment Fee*, 23 Bus.Law. 1065, 1065 (1968). Indeed, the only evidence in the record concerning reasonableness is testimony that in the Central Texas area a reasonable, and therefore

2. Ordinarily, there is another facet to this factor—at the time of closing the cost of money to the lender might be higher than the rate at which the loan is committed. There is nothing in this record, however, that indicates the rate which the association had to pay for its money at the time of this transaction, and at least theoretically, the association was not exposed to any risk of this type because the association was supposed to have the money in hand—escrowed. Additionally, the evidence establishes that even when all the pertinent factors are considered, a reasonable commitment fee was only one to two percent.

The current increase in the money market rate may be persuasive for statutorily increasing the allowable interest rate. This present increase, however, does not justify allowing lenders to extract additional interest through excessive fees for services rendered in conjunction with the loan.

bona fide, commitment fee is one to two percent of the principal. The association's president testified:

> Q  Tell us what loan fees are, as they prevail in the area of Central Texas.
>
> A  Well, ordinarily when a commitment is made, a loan fee, or a loan commitment fee is charged to the borrower at anywhere from one to two per cent, and is paid at the time the loan is made, or on acceptance of a commitment.

Applying the relevant factors to the facts of this case, the charge in question, equal to the highest legal rate of interest, was unreasonable as a matter of law. The charge for a one-year commitment at this rate would be ten percent; twenty percent for a two-year commitment. The cost to the association of making the commitment could not possibly accelerate that quickly, and such an excessive charge could not be rationally related to any of the purposes for which bona fide commitment fees typically are charged. The only conclusion that can be drawn from the amount of the charge is that the association was seeking extra compensation for a loan it considered particularly risky.

Although I would hold that the charge here is unreasonable as a matter of law, the trial court's judgment is assailable on another ground. Mr. Stedman's prima facie showing of a charge of usurious interest cannot be avoided without a finding that the charge was a bona fide commitment fee.[3] By proving that he had been charged interest in excess of the legal rate, Mr. Stedman established a prima facie case of usury, and the association had the burden to prove, as a matter of avoidance, that the charge was a bona fide commitment fee. *Kissell Co. v. Gressley,* 591 F.2d 47, 52 (9th Cir. 1979); *see Watts v. Mann,* 187 S.W.2d 917, 929 (Tex.Civ.App.—Austin 1945, writ

ref'd).  In *Kissell* the court held that once the borrower shows that the lender has exacted interest charges and fees in excess of the maximum legal rate there is a prima facie showing of usury, and the lender has the burden of proving that the additional charges were not interest. There, as is the case here, there was no evidence that the charge was reasonable, and therefore, the court held that the lender failed to meet its burden.

Moreover, the trial court in its findings of facts found only one of the two necessary elements of a bona fide commitment fee; the court made no finding on reasonableness. Because Mr. Stedman specifically objected and requested that the trial court make additional findings of fact and conclusions of law on the fee's reasonableness and the trial court refused, reasonableness cannot be presumed found in favor of the judgment. Therefore, at the very least, the cause should be remanded to the trial court for findings on the reasonableness issue.

### NO EVIDENCE THAT CHARGE WAS FOR THE COMMITMENT

Interest and bona fide commitment fees have different purposes and characteristics, and in order to conclude that a charge is one or the other, the court must look to all of these characteristics and attempt to ascertain whether the charge fits the purposes and characteristics of the designation it adopts. *Kissell Co. v. Gressley, supra.* The ultimate facts or characteristics of the charge are questions of fact, but the definition of "commitment fee" or "interest" is a question of law. Whether the characteristics of a particular fee more closely conform to the characteristics of interest or those of a commitment fee is a legal conclusion and is subject to review by this court. There-

---

3.  The association's contention that the disputed charge was a bona fide commitment was a matter of avoidance and should have been specifically pled. The association's general denial did not give Mr. Stedman notice that the association's theory of defense would be that the charge was not interest because it was a bona fide commitment fee. Nor was any notice given during discovery, even though Mr. Stedman

specifically requested that the association inform him if it intended to contend that the charge was something other than interest. To allow the association to prevail on its contention that the charge was a bona fide commitment fee, in the absence of pleadings, violates the policy of avoiding a trial by ambush. Tex. R.Civ.P. 94.

fore, this court may decide that under the facts, the fee in question was interest as a matter of law.

The holding in *Gonzales County Sav. & Loan, supra,* relied on by the majority, is not to the contrary. In *Gonzales* the designation of the fee in question was contested; the savings and loan association contended that the fee was a commitment fee, or alternatively a broker's fee, and the borrower contended that the fee was a cloak for charging interest. Under those circumstances, the court held that the question whether the charge was merely a device to conceal usurious interest was a question of fact. In the present case, however, the letter which frames the parties' agreement unambiguously requires that Mr. Stedman pay interest, and the association has admitted that the charge was interest.

*Characteristics of a Bona Fide Commitment Fee*

A bona fide commitment fee purchases an option which permits the borrower to enter into the loan in the future, and is paid to the lender as a separate and additional consideration apart from the lending of money. *Gonzales County Sav. & Loan Ass'n, supra,* at 906. A lender's commitment is commonly in the form of a unilateral contract by which the lender agrees to stand ready to loan a certain sum of money at an agreed rate of interest and loan term. It has been commonplace in the lending industry, though not absolutely necessary, for the lender to require the borrower to pay a fee at the time the commitment is made or accepted. Loiseaux, *Some Usury Problems in Commercial Lending,* 49 Tex.L. Rev. 419, 423 (1971); Wolf, *The Refundable Commitment Fee,* 23 Bus.Law. 1065, 1065 (1968). This fee may be refundable or nonrefundable depending on the specific purpose for which it is charged, the type of lender involved, and the project to be financed.

Factors to be considered in determining whether a fee is interest or a bona fide commitment fee include: (1) what expenses the fee is designed to defray; (2) whether the amount of the fee is dependent on the amount of the loan or the risk of the enterprise being financed; (3) whether the fee is a one-time charge or is assessed throughout the life of the loan; (4) whether the fee is charged on the entire committed amount regardless of the size and period of the outstanding balances; and (5) the difference between the lender's internal accounting treatment of the fee and that of interest. *Fikes v. First Fed. Sav. & Loan Ass'n,* 533 P.2d 251, 265 (Alaska 1975). Consideration of these factors in the context of the facts of this case clearly indicates that the ten percent per annum charge was interest.

(1) Expenses to be defrayed

The charge was not designed to compensate the association for services rendered to Mr. Stedman in connection with making the loan. Separate charges were made for these services. The ten percent charge was intended to exact additional compensation from the borrower for a loan the association was reluctant to make. Interest, not a bona fide commitment fee, is designed to compensate the lender for the risk of the enterprise.

(2) Amount of fee dependent on risk of enterprise

The purpose and amount of a charge also are important considerations in determining as a matter of law that the charge is either a bona fide commitment fee or interest. A bona fide commitment fee is generally payable upon the issuance of the commitment and is designed to compensate the lender for the opportunity cost, the administrative burden of underwriting the loan, and the cost of holding the funds available for the borrower's use in the event that the loan is funded. Interest is charged to compensate the lender for the risk of making the loan and for the lender's overhead costs.

Therefore, the underlying fact question regarding these factors is whether the charge was made to compensate the lender for the risk of the enterprise. The trial court's finding number 19 states that:

(19) During the period of time relevant to the facts giving rise to this law suit,

Defendant was reluctant to make commercial loans, particularly to finance restaurants, due to the facts that Defendant considered such loans to be of a high risk nature and that the demand for low risk residential loans was great, actually exceeding throughout this period of time the amount of money Defendant had available to lend. By setting aside and reserving the funds on its books, Defendant reduced the available money for residential loans.

This finding demonstrates that in charging the fee under dispute the lender was seeking extra "compensation" for a particularly risky loan. Interest is authorized and charged to compensate the lender for the risks peculiar to the project to be financed. A bona fide commitment fee is not charged for this purpose. *See Gonzales County Sav. & Loan Ass'n v. Freeman, supra,* at 906.

The testimony of the association's president also indicates that the fee was charged for a purpose more consistent with interest than with a bona fide commitment fee. Upon questioning by the court, the president testified that the charges made by the association for commitments were an additional source of income for the association. The purpose of bona fide commitment fees is to protect the lender from shifts in the money market during the period of the commitment. A bona fide commitment fee's purpose is not to provide additional compensation to the lender for making the loan or to compensate the lender for general overhead expenses. *See* Sintenis, *Current Treatment of the Non-Refundable Commitment Fee and Related Problems,* 86 Banking L.J. 590, 595 (1969). The lender's compensation for his overhead cost of conducting the money lending business is interest. *Eastern Mortgage & Sec. Co. v. Collins,* 118 S.W.2d 479, 481 (Tex.Civ.App.—Galveston 1938, writ ref'd). In *Eastern* the court said that overhead expenses were not costs that were legitimately chargeable to the borrower by separate fees, and if separate fees charged to the buyer were applied to the overhead cost of the lender's business, the charges would be considered interest. *Id.*

**(3) Not a one time charge**

A charge that is assessed throughout the term of the commitment and continued throughout the life of the loan indicates that the charge was interest; bona fide commitment fees are a one-time charge made at the time the commitment is accepted. *See Fikes v. First Fed. Sav. & Loan Ass'n, supra,* at 265 n. 27. The evidence clearly indicates, and the trial court found, that the charge made here was not a one-time charge, as bona fide commitment fees are, but rather was a continually accruing charge which was paid monthly. The constantly accruing nature of the charge is a characteristic of interest and not that of a bona fide commitment fee.

In addition, the trial court found that the charge was a "yardstick to reflect the *changing* price of the option." (emphasis added). The longer the commitment remained in effect or unexercised, the greater the amount that the association earned. This changing price also is characteristic of interest. Bona fide commitment fees, on the other hand, are a fixed amount and should not become more expensive the longer the commitment runs. The administrative costs of making the commitment should not increase with the length of the commitment period. The only difference in cost to this lender between a one month commitment and a one year commitment would be the potential for an increase in the rate obtainable at the time of closing or in the amount the funds would earn if invested elsewhere. These risks are not applicable to this transaction because by charging Mr. Stedman a fee equal to the highest legal rate of interest on money which the association purportedly had on hand, the risk of the money market did not shift to the association. Moreover, when a lender sets the period for which the commitment is to run based upon a reasonable idea of how long the construction will take, he will charge a fee that will compensate him for his costs over the entire period. If the construction has not been completed by the end of the commitment period, the borrower's option

has expired, and he must seek a new commitment. Thus the changing price here was not rationally related to any of the *purposes* for which bona fide commitment fees typically are charged.

#### (4) Charge on entire committed amount without regard to size or period

When, as is the case here, both the disputed charge and interest are assessed on the same amounts committed or balances outstanding, the Alaska Supreme Court has said, "it would be difficult to resist drawing the inference that the loan fee was but another name for more interest charges." *Fikes v. First Fed. Sav. & Loan Ass'n, supra*, at 265 n. 27.

#### (5) Internal accounting treatment of charge

Another factor which may be considered in determining whether a charge is interest or some other type of charge is the internal accounting treatment given it by the lender. If there is no important difference between the lender's internal accounting treatment of the disputed charge and its accounting for interest, it would indicate that the disputed charge was merely a subterfuge for additional interest. *Fikes v. First Fed. Sav. & Loan Ass'n, supra*, at 265 n. 27.

In this case the association ledgers, which are a part of the record, reflect that the charge was treated as interest. The association not only treated the charge as interest, it repeatedly designated it interest. The commitment letter provided that "interest shall begin to accrue from" the date the commitment is accepted. The association sent Mr. Stedman five statements for "interest due" between October 2, 1975 and February 3, 1976, and admitted in response to requests for admissions that interest was charged.[4] Finally the president of the association admitted at trial that the charge was "interest" and not a commitment fee.

The trial court filed findings of fact and conclusions of law. Most of the court's findings of fact, however, were in reality legal conclusions which would be true only if there actually was a valid commitment. For example, the court held that the charge obligated the association to make the loan, that it entitled Mr. Stedman to a distinctly separate consideration apart from the loan, and that it was charged as separate consideration for a separate transaction. If the charge was actually a bona fide commitment fee, these conclusions would then be legally correct.

The only true findings of fact by the trial court are: (1) that the charge was paid in return for the issuance of the commitment; (2) that two separate transactions existed—a commitment to stand ready to make a loan and a subsequent loan; (3) that the payments in question were made prior to disbursement of the loan; (4) that the charge was a yardstick used to express the changing price at which the option could be exercised; and (5) that the association was reluctant to make commercial loans when it had sufficient demands for "safer" residential loans.

Of these five fact findings only the first is probative on the question whether the charge here was a bona fide commitment fee. The other four findings are not determinative of the question. The last two findings indicate that the charge had characteristics of interest rather than those of a bona fide commitment fee. The remaining two findings—two separate transactions and payments prior to execution of the loan—also are not decisive of the question whether the charge is interest or a bona fide commitment fee because they are indicative of and equally consistent with a conclusion that the charge was interest.

The fact that a separate commitment may have existed has no probative force concerning the legal nature of the fee. There are many bona fide services rendered by the lender, or his agents, to the borrower which constitute, in essence, "separate"

---

4. The association admitted that interest was charged as that term is defined in paragraph 8, exhibit A (the commitment letter).

transactions and for which the lender is entitled to a legitimate separate consideration; i. e., brokerage fees, investigation expenses, appraisal, title search, insurance, document fees, filing and recording fees, attorney's closing fees. A legitimate fee charged for services in addition to the actual advance of funds is not interest. *See, e. g., Gonzales County Sav. & Loan Ass'n v. Freeman, supra,* at 907–08; *Greever v. Persky,* 140 Tex. 64, 165 S.W.2d 709, 712 (1942); *Nevels v. Harris,* 129 Tex. 190, 102 S.W.2d 1046, 1049 (1937). A lender, however, may not charge these fees "as a subterfuge to extract from the borrower more than lawful interest . . . ." *Morris v. Miglicco,* 468 S.W.2d 517, 519 (Tex.Civ.App.—Houston [14th Dist.] 1971, writ ref'd n. r. e.); *see Greever v. Persky, supra* ; *Nevels v. Harris, supra.* A bona fide commitment fee is merely consideration for another service rendered in addition to the advance of money, and like other charges, a lender may not use a commitment fee to extract additional interest. *Kissell Co. v. Gressley,* 591 F.2d 47, 52 n. 3 (9th Cir. 1979); *see Trinity Fire Ins. Co. v. Kerrville Hotel Co.,* 129 Tex. 310, 103 S.W.2d 121, 125 (1937) (court rejected contention that $12,000 "handling fee" was payment for a separate and independent transaction and therefore not usurious).

Further, the fact that the charges in dispute were made prior to disbursement of the loan is not decisive since it is only one of the many characteristics of a commitment fee, and is equally consistent with a conclusion that the charge was interest. Lenders frequently require that interest be paid prior to the disbursement of the loan through front-end interest or points.[5]

After examining the nature, purpose, and characteristics of the charge made by the association, I am compelled to conclude that the charge in question does not meet the legal definition of a bona fide commitment fee. In sum, the characteristics of the charge and the facts found by the trial court and in the evidence add up to a designation of the charge as interest, not a bona fide commitment fee. *See Kissell Co. v. Gressley, supra,* at 52.

*No Evidence*

Moreover, there is no evidence to support the only characteristic of a bona fide commitment fee found by the trial court. All the evidence indicates that the disputed charge was intended to compensate the association for making the loan and was not consideration paid in return for Mr. Stedman's option to take the loan. The evidence indicates that the association had consistently considered the charge as interest and treated it as such. The term "commitment fee" was never even mentioned until midway through the trial.

The commitment letter which established the agreement between the association and Mr. Stedman provided:

(8) Upon acceptance hereof the Association will set aside and escrow the funds for the project and *interest will begin to accrue from that date.*[6] (emphasis added).

The association also billed Mr. Stedman for "interest due" on five different occasions. Throughout discovery the association characterized the charge as interest. In response to Mr. Stedman's request for admissions the association admitted that the charge was interest, and in answering interrogatories numbers 22 and 23 the association refused to contend that the charge was anything other than interest:

$1,243,345 in commitments and only $562,818 in available lendable funds. Thus, the $60,000 was available for investment by the association in the short-term money market.

As additional consideration for the commitment and loan, the association "encouraged" Stedman to bank at Citizens State Bank. Members of the same family are the principal stockholders in both Citizens and Georgetown Savings and Loan Association.

---

5. In fact, the record indicates that at least one $500 "interest" payment on the commitment was made after the loan was closed. The addition of $500 to the finance charge paid on the $60,000 loan results in a charge of usurious interest.

6. The court of civil appeals observed, and this observation is supported by the evidence, that the association did not escrow the funds. 515 S.W.2d at 417. In fact, the association had

## INTERROGATORIES

*Interrogatory No. 22:* In answer to Requests No. 7, 8, 9, 10, 12, 13, 19, 20, 21, 22 and 23 of Plaintiff's First Request for Admissions, you have admitted all Requests, qualifying your admission as follows:

"The term 'interest' being used in the same manner as in paragraph 8 of Exhibit A."

Is it your contention that the term "interest" as used in paragraph 8 of Exhibit A differs from the legal definition of the term "interest" as contained in Article 5069–1.01 of the Revised Civil Statutes of the State of Texas?

*Interrogatory No. 23:* If you have answered the preceding interrogatory to the effect that the term "interest" as used in paragraph 8 of Exhibit A differs from the statutory definition of such term, please set forth the facts on which you base your contention.

## ANSWERS

*Interrogatory No. 22:* Defendant objects to Interrogatory No. 22 for the reason that it requires a legal conclusion as to the term "interest." Defendant can state, however, that at the times in question Defendant did not contemplate becoming involved in litigation over the questions raised by Plaintiff in this lawsuit and, accordingly, used the term "interest" in a generic sense with no specific definition in mind.

*Interrogatory No. 23:* See Defendant's response to Interrogatory No. 22.

Thus, even though Mr. Stedman specifically requested that the association explain the qualification of its answers and inform him if it intended to argue that the charge was anything other than interest, the association hid behind a vague, ambiguous answer instead of asserting that it considered the charge to be a bona fide commitment fee rather than interest.

Throughout his testimony, either in his deposition or at trial, the association's president, Mr. Morse, admitted that the charge was interest:

Q Number four provides for interest to begin upon acceptance of commitment; is that correct?

A It says "No fees—Interest begins upon acceptance of commitment."

Q All right. Does that mean that the association would begin charging interest upon the issuance of the commitment letter to Mr. Stedman?

A Upon acceptance of the commitment.

(Deposition, page 11).

Q Now, you are aware, are you not, Mr. Morse, that Mr. Stedman was paying the association interest on the 60,000 at the rate of 10 percent per annum prior to the time the funds were disbursed?

A I was aware that there was a charge being made to him on a monthly basis for that, yes, sir.

Q A charge on a statement which bore the words interest?

A Yes, sir.

Q And you were further aware that during the same months that he was paying 10 percent to the association on this loan that he was also paying interest to the Citizens State Bank for his interim financing?

A Yes, sir.

Q So you knew that he, in effect, was paying interest at two different institutions on the same dollar?

A I was aware that he was paying interest at two institutions, yes, sir.

(Deposition, pages 32–33)

Q Now, Mr. Morse, were any loan fees charged for that commitment or for the permanent financing that issued from, at a later date?

A No loan fees, no, sir.

Q Tell us what loan fees are, as they prevail in the area of Central Texas.

A Well, ordinarily when a commitment is made, a loan fee, or a loan commitment fee is charged to the borrower at anywhere from one to two per cent,

and is paid at the time the loan is made, or on acceptance of a commitment.

(SF 37).

Q You mentioned in response to Mr. Thomas's question that when you issued this commitment and charged a 10%, what you could have done is charge the usual one or 2% commitment fee?

A Yes, sir.

(SF 52).

Q Now, do I understand you correctly to say that this is the only loan ever made by this association where interest was charged on the funds before they were disbursed to the borrower?

A No, sir.

Q Had the association made similar loans prior to the Stedman loan?

A I don't recall if it was prior to or subsequent. I don't know.

(Deposition, page 31).

The only time the term "commitment fee" was used was at a point midway through Mr. Morse's testimony at trial, and at that time he merely discussed the general characteristics of a commitment and a bona fide commitment fee; he never said that the charge made to Mr. Stedman was a bona fide commitment fee:

Q Do you regularly issue these commitments for the loans that you make?

A We issue commitments—the loan applications on any type of loan that comes into the Association, we issue a commitment at that time to a borrower or to the applicant, who then has a certain length of time to accept that commitment, and in many instances, to pay a commitment fee for that commitment. When that commitment fee is paid and the signed commitment is returned to us, then the Association is obligated to make the loan on some future date, but, of course, the borrower is under no obligation to take the loan at some future date.

(SF 32–33).

*Judicial Admissions*

The association is conclusively bound by these judicial admissions of its agent. Mr. Morse's admissions that the charge in ques-

tion was interest were: (1) made during the course of a judicial proceeding; (2) contrary to an essential fact in the association's defense; (3) deliberate, clear, and unequivocal; and (4) related to a fact upon which a judgment for the opposing party may be based. Additionally, giving conclusive effect to the admissions would not be against public policy. Therefore, the association is bound by the admissions. *Griffin v. Superior Ins. Co.,* 161 Tex. 195, 338 S.W.2d 415, 418 (1960); *Miller v. First State Bank,* 551 S.W.2d 89, 102 (Tex.Civ.App.—Fort Worth 1977), *aff'd as modified,* 563 S.W.2d 572 (Tex.1978). The court in *Griffin* said:

> As long as the . . . admission stands unretracted, the fact . . . admitted, . . . is accepted as true by the court and jury and binding on the party making it, i. e., he cannot introduce evidence to contradict it.

*Griffin v. Superior Ins. Co., supra,* at 418. The circumstances surrounding the admissions in *Miller v. First State Bank, supra,* were similar to those here. In *Miller* the bank's president admitted during his testimony all the facts necessary to find usury. Therefore, the court of civil appeals held that the facts were conclusively established as judicial admissions on the part of the bank *which precluded the trial court from finding any facts to the contrary. Id.* at 102. After modifying the measure of damages portion of the court of civil appeals judgment, the supreme court affirmed. 563 S.W.2d 572. In affirming, the supreme court said that the undisputed admissions of the material facts by the bank president indicated that the loan was usurious.

Thus, the nature of the disputed charge is established by the association's own admissions. The charge was intended to be and was interest. The case relied on by the majority, *Delta Enterprises v. Gage,* 555 S.W.2d 555 (Tex.Civ.App.—Fort Worth 1977, writ ref'd n. r. e.), is clearly distinguishable. In *Gage,* the defendant's attorney during the real estate transactions in question testified that although denominated as interest, the disputed payments were in fact intended as payments for the right

to purchase the real estate. *Id*. at 557. In the present case, however, Mr. Morse never disputed Mr. Stedman's contention that the charge was interest.

### "Labels" Rule Inapplicable

The majority simplisticly relies on the language in *Gonzales County Sav. & Loan Ass'n v. Freeman, supra,* at 906 which says that the labels placed on charges by the parties are not controlling. This reliance is misplaced. The language in *Gonzales* which states that the "labels" rule should be applied to both borrowers and lenders alike is overly broad and overlooks the purposes and policy behind the rule. The purpose of the rule is to prevent a lender from collecting usurious interest by labeling the charge something other than interest. The rule is not really addressed to a situation, like the present one, in which both parties, consistently and without qualification, call a charge interest and a court later determines that the fee was actually some other type of charge. The rule certainly is not intended to protect a lender, knowledgeable in the terms of his industry, from usury penalties when he means to charge interest and unequivocally so states throughout the transaction and the trial. Mr. Morse had been with the association for over seventeen years and understood exactly what was meant by the term interest. Thus, the rule as relied on by the majority ignores the clear intent of the association. If the association had intended that the charge be a bona fide commitment fee it surely would have said so. The real policy behind the rule is to insure that the court looks past the form of the transaction, or label, and to the substance. The previous comparison between the characteristics of this charge and the characteristics of interest and bona fide commitment fees clearly shows that the charge was, in both form and substance, interest and was employed by the association as a means of extracting additional compensation for the loan.

Thus, the majority chooses to overlook the clear intent of the association and to ignore that in substance the charge here is nothing more than a charge of additional interest. In "labelling" this interest charge a bona fide commitment fee, the majority has apparently abandoned this court's previous pronouncement in *Stacks v. East Dallas Clinic*, 409 S.W.2d 842, 845 (Tex.1966), that "[w]here the parties designate a payment as interest, then interest it will be."

### DEFINITION OF INTEREST

Under the majority's purblind holding in this case, a lender may now safely collect additional compensation for a loan up to the highest legal interest rate merely by contending that the charge was intended as a bona fide commitment fee. In fact, since the majority holds that such a charge cannot be the basis of a usury suit regardless of how unreasonable it might be, lenders could make charges greatly in excess of the legal interest rate. As a result of the majority's holding in this case, loans are likely to develop an automatic "commitment period" during which the lender retains the use of the money and collects interest from the borrower. This loophole effectively abrogates the statutory ceiling on interest rates.

The majority contends that the charge in question was not for the use, forbearance, or detention of money and therefore, cannot be interest. The evidence establishes, however, that the charge *was* paid for the use, forbearance, or detention of money. If Mr. Stedman did not continue to make the monthly interest payments, the association would have canceled the loan. The evidence shows that although the payments were a condition precedent to Mr. Stedman receiving the use of the money through the loan, the association refused to allow him actual use of the funds during the eight month period in question. A letter was written to the association requesting that Mr. Stedman have the use of the interest on the "escrowed" funds as a set-off to the ten percent per annum fee charged to him. The association's response to this letter was testified to at trial:

Q Did you get a letter in reply to it?

A We got a letter, I believe, canceling our commitment with the Savings & Loan.

.     .     .     .     .

Q Did you receive any other response other than one cancelling the commitment?

A I actually talked to Skip [Mr. Morse] on the phone about that and discussed it with him. He said we would have to pay the interest on the money in escrow or that would be it.

(SF 9). This testimony indicates that it was necessary for Mr. Stedman to make the payments in order to receive the use of the money.

Part of the problem that the majority has with fitting the charge in question into the definition of interest is that all but one of the payments were made before the funds were disbursed. Lenders, however, frequently require that interest be paid in advance, and heretofore, the courts have not had problems classifying the charges as interest. Once a court determines that a charge was not actually intended as compensation for a separate service provided by the lender in conjunction with the loan, either because of the characteristics of the charge made or its excessive amount, the charge will be *deemed* interest.

Any conceptual problems that may exist can be remedied by proper economic analysis. *See generally* St. Claire, *The "Spreading of Interest" Under the Actuarial Method*, 10 St. Mary's L.J. 753 (1979). Since economically a charge cannot actually be considered interest until it accrues, the correct analysis of all charges in advance of the loan is to consider them as reductions of the principal and compute the interest rate on the reduced principal. *See id.* at 756–57. Under this analysis, there are three analytical steps necessary for determining if this particular transaction is usurious: (1) the charge is not a legitimate, bona fide fee; (2) the effect of the charge is to reduce the amount of the principal of which the borrower has the use; (3) the interest charged is computed against this reduced principal to determine if the interest rate is over ten percent.

In the present case Mr. Stedman received a loan for $60,000; however, he had been required to pay $3,383.31 to the association.

Thus he actually received the use of only $56,616.69. When the finance charge noted on the association's own amortization tables, $55,875.21 is computed against this reduced principal, the rate of interest is 10.47%. If the interest rate is computed as a $60,000 loan at $59,258.52, the stated finance charge plus the $3,383.31 additional interest payments, the rate is 10.48%. Thus, either under the suggested reduction of principal method or under the traditional method of computation, the transaction in question was usurious.

The possibility that under some contingency the charge would not have constituted interest does not save the association from the usury penalties when the loan is actually made and usurious interest is actually charged. In *Shropshire v. Commerce Farm Credit Co.*, 120 Tex. 400, 30 S.W.2d 282, 285 (1930), *motion for rehearing overruled*, 120 Tex. 400, 39 S.W.2d 11 (1931), the court said, "[A] contract is usurious when there is any contingency by which the lender may get more than the lawful rate of interest . . . ." The fact that in a hypothetical situation the charge might not be interest does not mean that the charge here was not interest. The majority notes that in oral argument counsel for Mr. Stedman said that the charge would not have been interest if the loan was not made. This statement is of dubious validity since, as explained earlier, the charge, in actuality, was made for the use of money. In any event, however, the loan here was made, and interest was charged. The association should not be relieved of liability merely because under a hypothetical situation the charge it received might not be interest.

For all the reasons indicated above, I dissent and would reverse the judgments of the trial court and court of civil appeals. Although I would reverse and render because of the complete absence of evidence that the $3,383.31 charge was a bona fide commitment fee, at the very least this cause must be remanded to the trial court for findings concerning the reasonableness of the charge.

**502**

POPE, Justice, dissenting.

The more we define clear words, the more we confuse them. By definition, Niagara Falls is an institution because it has continuity, movement and coherence.

> "When I use a word," Humpty Dumpty said, in a rather scornful tone, "it means just what I choose it to mean—neither more nor less."
>
> "The question is," said Alice, "whether you can make words mean so many different things."
>
> "The question is," said Humpty Dumpty, "which is to be master—that's all."

The experienced lender in this instance put in writing that there would be a 0% loan fee but that *"interest* shall begin to accrue from" the date the Association set aside the funds, though not yet loaned to plaintiff.

The President of the lending agency, when questioned about this writing and the words that said there would be no loan fees, explained it by again saying that the Association would begin charging *interest* upon the issuance of the commitment letter to *Mr. Stedman,* even *before* the *money* was advanced.

The lender billed Stedman on five different occasions for "interest due" for the unadvanced funds.

The lender's efforts to explain away these damaging admissions was that it "did not contemplate becoming involved in litigation . . . and used the term 'interest' in a generic sense with no specific definition in mind." The explanation was that when the lender wrote into its contract that "interest" was being charged, it meant "generic interest." The logic runs in this fashion, "interest" equals "generic interest" which equals no interest at all.

The majority's reliance upon *Gonzales County Savings and Loan Association v. Freeman,* 534 S.W.2d 903 (Tex.1976), is misplaced. Our holding in that case was that a two percent charge for what was called a "loan fee" was a loan fee and not interest. Here the majority holds that 5.6% "interest" is not interest and that "generic interest" means a commitment fee.

> "Alice was too much puzzled to say anything . . . ."

I respectfully join in the dissent.